1
2
3
4
5
6
7
8
9                    IN THE UNITED STATES DISTRICT COURT

10               FOR THE EASTERN DISTRICT OF CALIFORNIA

11   ERIC JON HASELTON,

12               Petitioner,              No. CIV S-01-0903 GEB JFM P

13         vs.

14   DIRECTOR, CALIFORNIA
     DEPARTMENT OF CORRECTIONS,
15               Respondent.             FINDINGS & RECOMMENDATIONS

16   _____/

17               Petitioner is a state prisoner proceeding through counsel with an application for a

18   writ of habeas corpus pursuant to 28 U.S.C. § 2254.  Petitioner challenges his 1999 judgment of

19   conviction for assault with force likely to produce great bodily injury and personally inflicting

20   great bodily injury on the victim.  Petitioner admitted he had a prior serious felony conviction

21   which qualified as a strike under the Three Strikes law.  Petitioner claims that his retained trial

22   attorney provided ineffective assistance of counsel because a former co-defendant who testified

23   at trial was represented by the law partner of his trial attorney.  This court has determined that the

24   petition for writ of habeas corpus should be denied.

25   /////

26   /////

FACTUAL AND PROCEDURAL BACKGROUND[1]

The second amended information charged Dana Ruben Franklin, Joseph Dewayne Randell, Rickie C. Sanford, and [petitioner] with unlawfully assaulting and personally inflicting great bodily injury on Ryan Jorgensen.  Retained counsel Russell Miller represented [petitioner], and his law partner Timothy Pappas represented Randell.  [Petitioner] had filed a written waiver of his right to separate counsel at his September 8, 1998 arraignment, which stated:

"1.  I understand that I have a right to be represented by an attorney who has no duty to represent any other defendant related in any way to my case.

"2.  I understand that if I am unable to pay for a separate attorney, the Court will appoint a separate attorney for me in accordance with the current law; which, depending on my economic status, could be at no cost to me.

"3.  My attorney has fully disclosed with me the risks and dangers of his continued representation of both me and the other defendant(s) in my case, and I understand the risks and dangers as my attorney has explained them to me.

"4.  My attorney has also informed me of my right to obtain the opinion of another attorney, not involved with this case, about the risks and dangers of my attorney's continued representation of both me and the other defendant(s) in my case.

"5.  Having fully discussed each of the above items with my attorney, I hereby freely and voluntarily waive (give up my right to a separate attorney in this case and agree that my attorney may continue to represent both me and the other defendant(s) in my case."

There is no reporter's transcript of the September 8, 1988, arraignment, but the court clerk checked the box "INF. of RTS." on the minute order.

At a September 28, 1998, hearing, the court began by asking, "First off, isn't there a conflict between Mr. Miller and Mr. Pappas, aren't they partners?"  Miller responded, "Yes, we're partners, your

/////

---

[1]  The facts are taken from the opinion of the California Court of Appeal for the Third Appellate District in People v. Haselton, No. C032249 (September 19, 2000), a copy of which is attached as Exhibit B to Respondent's Answer, filed February 4, 2002.

Honor.  And we'll file with the Court a statement of independent counsel and a waiver thereof."  Only the above-quoted waiver appears in the record.

Franklin entered a plea on January 7, 1999, the first day of trial, and testified for the prosecution.  Part way through the presentation of his evidence, the prosecutor moved to dismiss the case against Randell based on insufficient evidence and in the interest of justice.  The prosecutor indicated he would call Randell as a witness.  Attorney Pappas said he would be available if the prosecutor called his client to the witness stand.  The court granted the motion to dismiss.

Randell testified [petitioner] was one of his best friends.  He said [petitioner] unsuccessfully attempted to break up the fight between Richard Johnson and Jorgensen.  Randell watched as Franklin and Johnson kicked Jorgensen repeatedly in the upper body and head after he fell to the ground.  Randell testified he did not see [petitioner] again until he returned to [petitioner's] car to leave.  [Petitioner] got in the car, and pulled part way out of the space.  Shortly thereafter, Franklin and Johnson got into the car, and [petitioner] drove them to a friend's house.  Police later stopped and questioned Randell and [petitioner] en route to Randell's house.  Randell admitted at trial that he lied when he informed Officer Davis that he was not involved in the fight and did not know the names of the people involved.  He said he told Officer Davis, "'I never saw [petitioner] kick the . . . guy one time.'"  When the officer mentioned that [petitioner] had blood on his shoes, Randell responded, "'[Petitioner] may have kicked him once I think.'"  He explained at trial, "I thought maybe, you know, maybe he did kick him since he had blood on his shoe, but since I didn't see him, I don't know for sure."  Randell acknowledged he did not tell Officer Davis [petitioner] tried to break up the fight. the prosecutor emphasized in closing argument that Randell never said [petitioner] "'didn't do it.'"

(People v. Haselton, slip op. at 2-4.)

                                    ANALYSIS

I.  Standards for a Writ of Habeas Corpus

Federal habeas corpus relief is not available for any claim decided on the merits in state court proceedings unless the state court's adjudication of the claim:

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

/////

1            (2) resulted in a decision that was based on an unreasonable
2            determination of the facts in light of the evidence presented in the
           State court proceeding.

3 28 U.S.C. § 2254(d).

4       Under section 2254(d)(1), a state court decision is "contrary to" clearly

5 established United States Supreme Court precedents if it applies a rule that contradicts the

6 governing law set forth in Supreme Court cases, or if it confronts a set of facts that are materially

7 indistinguishable from a decision of the  Supreme Court and nevertheless arrives at different

8 result.  Early v. Packer, 537 U.S. 3, 7 (2002) (citing Williams v. Taylor, 529 U.S. 362, 405-406

9 (2000)).

10       Under the  "unreasonable application" clause of section 2254(d)(1), a federal

11 habeas court may grant the writ if the state court identifies the correct governing legal principle

12 from the Supreme Court's decisions, but unreasonably applies that principle to the facts of the

13 prisoner's case.  Williams, 529 U.S. at 413.  A federal habeas court "may not issue the writ

14 simply because that court concludes in its independent judgment that the relevant state-court

15 decision applied clearly established federal law erroneously or incorrectly.  Rather, that

16 application must also be unreasonable."  Id. at 412; see also Lockyer v. Andrade, 538 U.S. 63,

17 123 S.Ct. 1166, 1175 (2003) (it is "not enough that a federal habeas court, in its independent

18 review of the legal question, is left with a 'firm conviction' that the state court was 'erroneous.'")

19       The court looks to the last reasoned state court decision as the basis for the state

20 court judgment.  Avila v. Galaza, 297 F.3d 911, 918 (9th Cir. 2002).  Where the state court

21 reaches a decision on the merits but provides no reasoning to support its conclusion, a federal

22 habeas court independently reviews the record to determine whether habeas corpus relief is

23 available under section 2254(d).  Delgado v. Lewis, 223 F.3d 976, 982 (9th Cir. 2000).

24 II.  Ineffective Assistance of Counsel

25       Petitioner argues that his retained trial attorney rendered ineffective assistance

26 because counsel had a conflict of interest resulting from his law partner's concurrent

1   representation of petitioner's co-defendant, Joseph Randell.  Midway through the prosecution

2   case, the prosecutor dismissed charges against Randell and Randell was compelled to testify

3   against petitioner.  At the time the charges were dismissed for insufficient evidence and in the

4   interest of justice, the trial court did not inquire of petitioner concerning the conflict of interest

5   and/or whether petitioner continued to waive his right to conflict-free counsel.

6       A.  Legal Standards

7           The United States Supreme Court set forth the test for demonstrating ineffective

8   assistance of counsel in Strickland v. Washington, 466 U.S. 668 (1984).  First, a petitioner must

9   show that, considering all the circumstances, counsel's performance fell below an objective

10  standard of reasonableness.  Strickland, 466 U.S. at 688.  To this end, petitioner must identify the

11  acts or omissions that are alleged not to have been the result of reasonable professional judgment.

12  Id. at 690.  The federal court must then determine whether in light of all the circumstances, the

13  identified acts or omissions were outside the wide range of professional competent assistance.

14  Id.  "We strongly presume that counsel's conduct was within the wide range of reasonable

15  assistance, and that he exercised acceptable professional judgment in all significant decisions

16  made."  Hughes v. Borg, 898 F.2d 695, 702 (9th Cir. 1990) (citing Strickland, 466 U.S. at 689).

17          Second, a petitioner must affirmatively prove prejudice.  Strickland, 466 U.S. at

18  693.  Prejudice is found where "there is a reasonable probability that, but for counsel's

19  unprofessional errors, the result of the proceeding would have been different."  Id. at 694.  A

20  reasonable probability is "a probability sufficient to undermine confidence in the outcome."  Id.;

21  see also Williams v. Taylor, 529 U.S. at 391-92; Laboa v. Calderon, 224 F.3d 972, 981 (9th Cir.

22  2000).  A reviewing court "need not determine whether counsel's performance was deficient

23  before examining the prejudice suffered by the defendant as a result of the alleged deficiencies . . .

24  If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice

25  . . . that course should be followed."  Pizzuto v. Arave, 280 F.3d 949, 955 (9th Cir. 2002) (quoting

26  Strickland, 466 U.S. at 697).

B.  Conflict of Interest

Petitioner contends that defense counsel Russell W. Miller had a conflict of interest resulting from his co-defendant Joseph Randell's representation by Timothy R. Pappas, a member of the same law firm, Law Offices of Pappas & Miller.  (CT 13; see RT 10.)  Both Miller and Pappas were retained by petitioner and Randell, respectively.  (See CT 165.)  In addition, while Miller was representing petitioner during trial, the prosecution moved to dismiss the case against petitioner's co-defendant on the basis of insufficient evidence and in the interest of justice. (RT 679, 687.)

In this federal habeas proceeding petitioner now claims that defense counsel Miller's professional relationship with Pappas constituted an actual conflict of interest which adversely affected his representation of petitioner.

The Sixth Amendment entitles a criminal defendant to the effective assistance of counsel, unhindered by any conflicts of interest with her client.  See U.S. Const. amend. VI; Cuyler v. Sullivan, 446 U.S. 335 (1980); Holloway v. Arkansas, 435 U.S. 475 (1978).  This right contemplates counsel who is in a position both professionally and personally to represent his client with undivided loyalty.  Wood v. Georgia, 450 U.S. 261, 272-73 (1981); See also Campbell v. Rice, 302 F.3d 892, 897 (9th Cir. 2002).  Because the state's conduct of a criminal trial itself implicates the state in the defendant's conviction, courts do not distinguish between retained and appointed counsel because it would deny equal justice to defendants who choose their own lawyers.  Cuyler, 446 U.S. at 344-45.

Conflicts of interest broadly embrace all situations in which an attorney's loyalty to, or efforts on behalf of, a client are threatened by his responsibilities to another client or a third person or by his own interests.  (See generally ABA, Model Rules Prof. Conduct, Rule 1.7 and commentary (1983).  Conflicts may occur in various factual settings.  For example, conflicts may arise in circumstances in which one attorney represents more than one defendant in the same proceeding.  See, e.g., Holloway v. Arkansas, 435 U.S. 475, 481-91 (1978).  Conflicts may also

arise in situations in which an attorney represents a defendant in a criminal matter and currently has or formerly had an attorney-client relationship with a person who is a witness in that matter. See, e.g., Thomas v. Municipal Court, 878 F. 2d 285 (9th Cir. 1989); Leversen v. Superior Court, 34 Cal.3d 530, 536-540 (1983); Cowell v. Duckworth, 512 F.Supp. 371 (D.C. Ind. 1981). Conflicts may also arise where law partners are appointed to represent coindictees in their respective trials.  Burger v. Kemp, 483 U.S. 776 (1987).[2]

The rule against conflicts of interest serves to protect confidential information obtained during the course of an earlier representation, ensure undivided attorney loyalty and guard against infringement of the right to cross-examination.  See Sanders v. Ratelle, 21 F.3d 1446, 1452-53 (9th Cir. 1994); Fitzpatrick v. McCormick, 869 F.2d 1247, 1251 (9th Cir. 1989); United States v. Allen, 831 F.2d 1487, 1497 (9th Cir. 1987); Trone v. Smith, 621 F.2d 994, 999 (9th Cir. 1980).  It is more difficult for a defendant to show that counsel actively represented conflicting interests in cases of successive rather than simultaneous representation.  See Mannhalt v. Reed, 847 F.2d 576, 580 (9th Cir. 1988).  Courts "generally presume that the lawyer is fully conscious of the overarching duty of complete loyalty to his or her client."  Burger v. Kemp, 483 U.S. 776, 784 (1987).

In order to establish an ineffective assistance of counsel claim based on a conflict of interest a petitioner must show that an actual conflict of interest adversely affected his lawyer's performance.  Mickens v. Taylor, 535 U.S. 162, 174 (2002); Cuyler v. Sullivan, 446 U.S. 335, 348-350 (1980); Campbell, 302 F.3d at 897; Rosenwald v. United States, 898 F.2d 585 (7th Cir.1990) (petitioner was entitled to habeas relief based on attorney's simultaneous representation, on unrelated civil matter, of the Government's chief witness against defendant, after showing that

---

[2]  The Burger court assumed "without deciding that two law partners are considered as one attorney."  Id. at 783.  Because it is settled that joint representation is not a *per se* violation of the right to effective assistance of counsel, Holloway, 435 U.S. at 482, petitioner must still demonstrate an actual conflict of interest had an adverse affect on his lawyer's performance. Mickens, 535 U.S. at 173-74.  Thus, this court is not required to resolve whether two law partners are considered as one attorney.

attorney's representation of defendant was affected by simultaneous representation); Mannhalt, 847 F.2d at 582 (adverse effects found where a conflict "may have impacted the manner of the cross-examination" by the attorney).  The existence of an actual conflict "cannot be governed solely by the perceptions of the attorney; rather, the court itself must examine the record to discern whether the attorney's behavior seems to have been influenced by the suggested conflict." Sanders, 21 F.3d at 1452.[3]

The mere possibility that an attorney had a conflict of interest is insufficient to entitle a petitioner to relief.  Rather, he must show that: (1) his attorney actively represented conflicting interests, and (2) the conflict "actually affected" the adequacy of the attorney's representation.  Cuyler, 446 U.S. at 349-50; see also Campbell, 302 F.3d at 897; Lockhart, 250 F.3d at 1229.  A defendant "need not demonstrate prejudice in order to obtain relief."  Cuyler, at 349-50.  See also Delgado v. Lewis, 223 F.3d 976, 981 (9th Cir. 2000).  However, a defendant must show that "the attorney's behavior seems to have been influenced" by the conflict." Lockhart, 250 F.3d at 1231 (quoting Sanders, 21 F.3d at 1452).  "This showing need not rise to the level of actual prejudice. . . .  Nonetheless, it remains a substantial hurdle."  Id., (quoting Maiden v. Bunnell, 35 F.3d 477, 481 (9th Cir. 1994)).

A defendant may "waive his right to the assistance of an attorney unhindered by a conflict of interests."  Holloway, 435 U.S. at 483 n.5.  See also Garcia v. Bunnell, 33 F.3d 1193, 1195 (9th Cir. 1994) ("Even if counsel is subject to an actual conflict of interest, however, the trial court may generally allow the attorney to proceed if the defendant makes a voluntary, knowing, and intelligent waiver."); Allen, 831 F.2d at 1494 ("[o]f course, a defendant may waive his right to the assistance of an attorney who is unhindered by conflicts . . . provided the waiver is given knowingly and intelligently.")  Whether there is a proper waiver is to be determined by the

---

[3] If a defendant fails to object to representation by an attorney with a conflict, but shows on appeal that "an actual conflict of interest adversely affected his lawyer's performance," reversal is required.  Lockhart, 250 F.3d at 1229-30 (quoting Cuyler, 446 U.S. at 348).

1  trial court and any such waiver should appear on the record.  Johnson v. Zerbst, 304 U.S. 458,

2  464-65 (1938).  Resolution of the issue of waiver depends "upon the particular facts and

3  circumstances surrounding that case, including the background, experience, and conduct of the

4  accused."  Id.; see also Edwards v. Arizona, 451 U.S. 477, 482 (1981).

5      C.   Whether Petitioner Waived Right to Conflict-Free Counsel

6           The California Court of Appeal noted that there was no reporter's transcript of the

7  September 8, 1998 arraignment.  (People v. Haselton, slip op. at 9.)  The minute order reflected

8  the clerk had checked a box marked "INF. of RTS."  However,

9           [i]t is unclear from the minute entry whether the court's
            admonitions included those relating to waiver of conflict-free
10           counsel.  Moreover, there is nothing to indicate the court confirmed
            on the record that [petitioner] understood those rights and agreed to
11           waive them.  Once trial commenced, there was no further discussion
            of conflicts that might arise from [petitioner] and Randell being
12           represented by partners in the same law firm.

13  (Id. at 9-10.)  The state court went on to analyze whether there was an actual conflict or that

14  petitioner's right to effective representation was prejudicially affected, without specifically

15  addressing whether petitioner had exercised a valid waiver.  (Id. at 10.)

16           Because the state court explicitly ruled on other grounds, this court does not apply

17  AEDPA's deference to the discussion of petitioner's waiver.  Lewis v. Mayle, 391 F.3d 989, 996

18  (9th Cir. 2004).  Rather, the court reviews de novo[4] whether petitioner waived his right to conflict

19  free counsel, "while deferring to any factual findings made by the state court under 28 U.S.C.

20  § 2254(e)(1)."  Lewis, 391 F.3d at 996.

21           Petitioner may waive his right to the assistance of an attorney who is unhindered by
            conflicts.  Holloway v. Arkansas, 435 U.S. 475, 483 n.5 . . . (1978).  A valid waiver
22           of conflict of interest must be voluntary, knowing, and intelligent, such that the
            defendant is sufficiently informed of the consequences of his choice.  Belmontes v.

23

24           [4]  The "objectively unreasonable" standard employed under Delgado v. Lewis, 223 F.3d
25  976, 983 (9th Cir. 2000) is inapplicable because in Delgado the state court provided no rationale
    for its decision.  In the instant case, the state court did not hold petitioner validly waived his right
    to non-conflicted counsel but resolved the conflict of interest claim on other grounds.  Thus, a de
26  novo review is appropriate.  Lewis, 391 F.3d 996.

> *Woodford,* 350 F.3d 861, 885 (9th Cir.2003).  We are required to "ascertain with
> certainty" that a defendant knowingly and intelligently waived that right by
> "focusing on what the defendant understood."  *Lockhart v. Terhune,* 250 F.3d
> 1223, 1233 (9th Cir.2001) (citations omitted).

Lewis, 391 F.3d at 996.

In the instant case, it is undisputed that on September 8, 1988, petitioner signed a

"Notice of Right to Separate Counsel and Waiver" prior to trial.  (CT 13.)  However, there is no

reporter's transcript of the trial court's colloquoy, if any, with petitioner concerning the conflict

waiver.  The minute order from the September 8, 1988 arraignment reflects the court clerk

checked the box marked "INF. of RTS."

On September 28, 1988, at a hearing on a motion to consolidate and join

defendants, the court inquired whether there was a conflict based on the law partnership of Miller

and Pappas.[5]  (RT 2.)  Petitioner's counsel informed the court that he would file with the court a

statement of independent counsel and a waiver.  (RT 1-2.)  The trial court did not inquire of

petitioner whether the waiver was voluntary, knowing and intelligent.  (RT 2.)  No further

statement of independent counsel and waiver was subsequently filed.  (See CT 15 - 267.)

On January 20, 1999, outside the presence of the jury, the prosecution moved to

dismiss the charges against petitioner's co-defendant Randell on the basis of insufficient evidence.

(RT 679.)  The trial court inquired whether the prosecution intended to call Randell as a witness.

(RT 679.)  The prosecution stated he would call Randell as a witness, adding he would not be

calling any other witness that was present at the scene of the assault other than Randell.  (RT 680.)

Randell's attorney noted that there was no blood found on Randell's shoes or socks.  (RT 680.)

But the trial court noted that there was sufficient evidence if the jury believed the evidence:

> And that is the concern the Court has.  While many of the witnesses
> were not able to identify him as being involved, there is evidence
> that he was involved.  If that evidence is believed, it's sufficient for

---

[5]  At this hearing, Miller "stood in for" Pappas, representing petitioner's co-defendant
Randell as well as petitioner.  (RT 1.)  On the December 9, 1998 hearing on the prosecution's
motion to amend the complaint, attorney Pappas stood in for attorney Miller.  (RT 6.)

1      a conviction.

2  (RT 680.)  The prosecution responded that based on Ms. Andrews' testimony that only four

3  people were involved in the assault, her description of a guy in baggie pants and a white shirt

4  pointed to Richard Johnson, and she had identified petitioner and Mr. Sanford as the other two

5  perpetrators.  (RT 680.)  This information, coupled with their knowledge that Mr. Franklin was

6  the fourth perpetrator, meant that the prosecution could not in good faith argue that co-defendant

7  Randell committed the assault.  (RT 680-81.)  The trial court then took the prosecution's motion

8  under submission and after a few moments told the prosecution he could make his formal motion

9  in the presence of the jury.  (RT 682.)  The court stated it had a number of concerns, at which

10  point the judge held a bench conference that was unrecorded.  (RT 682.)

11      On January 20, 1999, outside the presence of the jury, the trial court stated it would

12  entertain either an interest of justice dismissal or a combination of interest of justice and

13  insufficient evidence based upon the weight of the evidence dismissal.  (RT 684.)  The

14  prosecution indicated he would make a combination motion, and the trial court indicated it would

15  grant such a motion brought before the jury.  (RT 684.)  The prosecution asked the court to make

16  Randell available to call as a witness.  (RT 684.)  The trial court responded affirmatively that

17  "once the charges [were] dismissed against [Randell] with jeopardy having already set in, he

18  would be free for [the prosecution] to call as a witness."  (RT 684.)  The court then went on to

19  discuss scheduling issues.  (RT 684-86.)

20      The jury was called in and the court informed them that the prosecution had moved

21  to dismiss defendant Randell for insufficient evidence, but that the court held that one witness'

22  testimony would support charges against Randell, so that motion was denied.  (RT 687.)  The

23  court further explained to the jury that the prosecution had stated that based on the weight of the

24  evidence he would not be arguing for a conviction of defendant Randell, so the court had

25  suggested the prosecution move to dismiss based on insufficient evidence and in the interest of

26  justice.  (RT 687.)  At that time the prosecution so moved, and the trial court granted the motion

1  to dismiss charges against defendant Randell.  (RT 687.)  The trial court noted defendant Randell

2  would remain in the courtroom stating, "because of double jeopardy, [Randell] can't be charged

3  again, and the People have indicated they want to call him as a witness."  (RT 688.)

4          This record fails to "demonstrate petitioner understood "any of the specific

5  ramifications of his waiver."  Lockhart v. Terhune, 250 F.3d 1223, 1233 (9th Cir. 2001).

6  Although the September 8, 1998 minute order appears to reflect petitioner was informed of rights,

7  it does not specify the rights petitioner was informed about.  The record reflects the trial court was

8  aware of a potential conflict.  (RT 1-2.)  Notwithstanding the fact that petitioner had earlier signed

9  a conflict waiver, the trial judge did not inquire further of petitioner as to whether it was a

10 knowing and voluntary waiver.  There is no record to determine the extent of the trial judge's

11 inquiry of petitioner, if any.  "While an accused may waive the right to counsel, whether there is a

12 proper waiver should be clearly determined by the trial court, and it would be fitting and

13 appropriate for that determination to appear upon the record."  Johnson v. Zerbst, 304 U.S. 458,

14 465 (1938).  There is no evidence petitioner was informed that his attorney owed him a continuing

15 duty of loyalty.  Belmontes v. Woodford, 414 F.3d 1094, 1118 (9th Cir. 2005).

16         Moreover, even if petitioner understood the theoretical risk of his attorney being

17 biased by his law partner's representation of petitioner's co-defendant and dismissed that risk as

18 unlikely, it is less likely that petitioner foresaw other potential consequences of the waiver, for

19 example, the fact that the prosecution would dismiss the charges against Randell and force him to

20 testify against petitioner.  Lewis, 391 F.3d 997.  At the time defendant Randell was transformed

21 from defendant to witness for the prosecution, there was no mention of how this change in

22 circumstance might have presented a conflict of interest by the law partners' simultaneous

23 representation of petitioner and Randell.  (RT 679-88.)  The trial judge did not revisit petitioner's

24 earlier waiver.  Although there was an unrecorded bench conference (RT 682), at which point the

25 trial judge could have raised conflict of interest issues, no mention of conflict of interest was

26 recorded during hearings held outside the presence of the jury, or when the court reconvened in

1  front of the jury.  (RT 679-86.)

2         Thus, at a minimum, it was incumbent upon the trial judge to further inquire of

3  petitioner at the time the prosecution moved to dismiss the charges against Randell and it became

4  clear Randell would be compelled to testify against petitioner.  A trial court has a duty to inquire

5  into a potential conflict of interest when it "knows or reasonably should know that a particular

6  conflict [of interest] exists."  Cuyler, 446 U.S. at 347.[6]  The transformation from defendant to

7  witness for the prosecution should raise a conflict of interest red flag where petitioner was

8  represented by counsel who was a law partner to Randell's counsel, and against whom Randell

9  would be testifying in the same proceeding.

10        On this record, this court cannot find petitioner exercised a valid waiver of his right

11  to conflict-free counsel.  Petitioner must now demonstrate that an actual conflict of interest

12  adversely affected his trial counsel's performance.  Mickens, 535 U.S. at 173-74.

13        D.  Actual Conflict that Adversely Affected Counsel's Performance

14        On direct appeal, petitioner argued that the Pappas & Miller representation of

15  petitioner and his co-defendant Randell prevented Miller from effectively cross-examining

16  Randell because Miller had a duty to preserve Randell's confidences, by virtue of his law

17  partnership with Pappas, who represented Randell.  (Petitioner's Opening Brief, appended to

18  Answer as Ex. A, at 31.)  Petitioner further contended that Miller's law partnership with Pappas

19  required Miller to take care not to expose Randell to a perjury charge.  (Id.)

20        Petitioner contends that there was much Miller could have cross-examined Randell

21

22        [6] Federal courts have incorporated this duty into the Federal Rules of Criminal
    Procedure.  Rule 44(c) of the Federal Rules of Criminal Procedure states that whenever two or
23  more defendants are jointly charged or have been joined for trial, and are retained by counsel
    who are associated in the practice of law, "the court shall promptly inquire about the propriety of
24  joint representation, and must personally advise each defendant of the right to the effective
    assistance of counsel, including separate representation.  Id.  This procedural rule heightened the
25  federal trial court's obligation set forth in previous case law:  Trial courts presented with a
    possible conflict have an affirmative duty to protect a defendant's rights, Glasser v. United States,
26  315 U.S. 60, 72 (1942), which duty arises when the possibility of conflict is "brought home to the
    court."  Holloway, 435 U.S. at 485 (quoting Glasser, 315 U.S. at 76).

1   about, had his law partner not represented Randell.  (August 1, 2005 Traverse at 6.)  Miller could

2   have cross-examined Randell about:

> the circumstances leading to the dismissal of the case against him. . . , whatever negotiations took place between his lawyer and the prosecution prior to the dismissal; whether his lawyer bargained for a dismissal that would provide double jeopardy protections; whether Randell agreed to be interviewed prior to his testimony as part of a dismissal agreement; whether there were any other requirements or understandings between the firm that represented Randell and petition that could be construed in any way to be quid pro quo.

8   (Id. at 6.)  Petitioner argues that it was unreasonable for the state court to ignore the possibility

9   that the dismissal was negotiated just because Randell did not testify pursuant to a plea agreement.

10  Petitioner contends it was critical for the jury to learn of any circumstances surrounding the

11  dismissal to accurately assess Randell's credibility when Randell testified that he lied when he

12  said petitioner was not involved in the assault.  Because of his law firm's duty of confidentiality to

13  Randell, Miller could not question Randell about that.  Petitioner contends the key question courts

14  address in assessing a conflict's adverse effect is "what the advocate finds himself compelled to

15  refrain from doing."  Holloway, 435 U.S. 490.

16        Petitioner further argues it was unreasonable for the state court to find Randell's

17  testimony was generally favorable to petitioner when Randell's testimony that he lied when he

18  claimed petitioner was not involved was "damning."  (August 1, 2005 Traverse at 6.)

19        Petitioner also argues that the state appellate court's conclusion that there was no

20  adverse effect on Miller's representation was objectively unreasonable.  (August 1, 2005 Traverse

21  at 5.)  Specifically, petitioner contends the state court's finding that the fact that Randell did not

22  testify pursuant to a plea agreement but was forced to testify once the prosecution dismissed its

23  case against him did not demonstrate an adverse effect was objectively unreasonable.  (Id. at 5.)

24  Petitioner contends the state court overlooked the fact that the trial judge was troubled by the fact

25  that there was enough evidence of Randell's involvement for the case against him to go to the

26  jury.  (Id. at 5-6.)  Despite this, the prosecution moved to dismiss the case and then called Randell

to the stand where he elicited Randell's testimony that when Randell previously denied petitioner was involved in the assault, it was a "bold faced lie."  (Id. at 6, quoting RT 804.)  Petitioner contends that this enabled the prosecution to "successfully argue that if petitioner's good friend Randell could not vouch for his non-involvement in the assault, petitioner must be guilty."  (Id., citing RT 1448.)

Petitioner further argued that the joint representation may have affected plea bargaining and sentencing.  (Petitioner's Opening Brief, appended to Answer as Ex. A, at 31.)

### i.  Review by the State Court

The state court ultimately rejected petitioner's argument on this issue:

> We conclude that even if the waiver was ineffective and the court erred in failing to inquire into the possibility of conflict when Randell was dismissed mid-trial, [petitioner] has not shown there was an actual conflict, or that his right to effective representation was prejudicially affected.  (Citation omitted.)

> Randell did not testify voluntarily as part of a plea agreement, but was forced to testify when the prosecution dismissed the charges against him.  The principal defense theory was misidentification.  After acknowledging he lied to police about not knowing who kicked Jorgensen, Randell emphasized he did not see [petitioner] kick Jorgensen.  His statement to the officer that [petitioner] might have kicked the victim once was in response to being told there was blood on [petitioner's] shoes.

> [Petitioner] suggests that "[t]rial counsel's performance was adversely affected because he was hindered in his ability to cross-examine Randell by the fact that he had a duty to keep Randell's secrets and confidences."  He complains that "[i]n cross-examination, the defense did not – and could not because of his ethical duty – seek to probe the truth of Randell's actual degree of involvement in the offense.  Such cross-examination would have strengthened Randell's motivation to shift some blame to [petitioner] and would have significantly undercut the prosecutor's claim that Randell implicated [petitioner] because [petitioner] was guilty and for no other reason."

> This argument is inconsistent with the circumstances of the case.  Regardless of the prosecutor's "spin" on Randell's testimony, the fact remains it was generally favorable to [petitioner].  The court had told the jury that the prosecution moved to dismiss the charges against Randell on the grounds of insufficient evidence and in the interest of justice.  In this context, it would not have been to

[petitioner's] advantage for Miller to show in cross-examination Randell was, in fact, involved in the fight.

(People v. Haselton, slip op. at 10-11.)

ii.  Cross Examination at Trial

During cross-examination, Randell confirmed that all the charges against him had been dropped but denied he had made a deal with the prosecution to get the charges dropped.  (RT 804.)  Randell admitted the dismissal of the charges had come as a surprise.  (RT 805.)  Randell denied he took the stand to purposefully lie and confirmed he was not lying for his friend, petitioner, or that he felt any need to lie for himself.  (RT 805.)

Randell confirmed that some events stood out more clearly in his memory than others.  (RT 805.)  Randell stated he remembered most of what he had told the officer the night of the assault, but not everything.  (RT 806.)

Randell stated he saw most of the assault until he left.  (RT 806.)  He testified they were still kicking the victim when he left the scene.  (RT 806.)  Randell testified it was not his idea to take pictures of his hands after he and petitioner arrived at petitioner's home.  (RT 806.)

Randell admitted he was nervous and scared when he was talking to the officer after the officer had pulled over petitioner's car.  (RT 806-07.)  Randell admitted that when he told the officer he didn't know anybody who was involved in the assault it was a lie, and that he was lying for the people who were involved and to protect himself from getting involved.  (RT 807.)

Randell confirmed that he was on federal probation at the time of the assault and that his status as a probationer was on his mind that evening and continued to be on his mind during the trial.  (RT 807.)  Randell admitted he was aware that if he perjured himself he could have his probation violated, that the possibility concerned him and that concern prompted him to tell the truth in his testimony.  (RT 807-08.)

Randell admitted that the officer who pulled over petitioner's car told Randell that

Eric had blood on his shoes.  (RT 808.)  When asked whether that gave Randell any reason to think harder about where Eric was the entire time of the fight, Randell responded that it did.  (RT 808.)  He confirmed the officer stated "you know you guys were involved.  You know you guys kicked him."  (RT 808.)  When asked whether he remembered telling the officer "maybe [petitioner] kicked him once or a couple of times?" Randell denied remembering he told the officer "or a couple of times."  (RT 808.)  Randell admitted that the officer was unfriendly and pressured Randell, accusing Randell of committing a crime Randell did not commit, and repeatedly asking him the same questions over and over.  (RT 809, 810.)  Randell testified that scared him.  (RT 809.)  When asked whether he changed his story from "I don't know anything or who it was" to "let me tell you what I do know" as a means to exonerate himself or separate himself from the incident, Randell said yes.  (RT 809.)

Randell admitted he felt bad about the victim being hurt but denied he would lie to protect the people who hurt him.  (RT 809.)  Randell admitted he had twice been convicted of a felony and had been involved with law enforcement when he was convicted of those two felonies. (RT 809-10.)  Randell conceded that the officers treated him "a little bit" fairly and honestly in the prior two convictions.  (RT 810.)  He stated he could not remember whether those officers made things up.  (RT 810.)

On recross-examination, petitioner's counsel asked Randell whether he was "lying that night at your first statement to the officer because you were afraid for yourself?"  (RT 814.) Randell answered affirmatively.  (RT 814.)

### iii.  Closing Argument at Trial

During closing argument, petitioner's defense counsel Miller conceded petitioner was in the area that night, but argued that petitioner had been misidentified.  (RT 1488.)  Miller noted there were too many eyewitnesses in this case and argued that none of their testimony matched perfectly.  (RT 1489.)  Miller pointed out that these witnesses had never seen anything like this before in their lives, by their own testimony, and reminded the jury that these witnesses

1  had emotions ranging from shock to crying, to panic, to nausea.  (RT 1489.)  Miller argued these

2  witnesses were under stress.  (RT 1490.)

3         In addition, Miller argued that Franklin lied to gain a lighter sentence.  (RT 1490;

4  1492.)  Miller pointed out that during the first half of the interview Franklin had with the district

5  attorney, petitioner's name was not mentioned.  (RT 1490.)  Miller argued that when it became

6  clear to Franklin that he wouldn't be offered a deal, he quickly changed his story to reduce the

7  possible prison time he was facing.  (RT 1490.)  Miller argued that Franklin made a deal with the

8  prosecution.  (RT 1491.)

9         Miller reminded the jury that the prosecution dismissed the charges against Randell

10  because there was no credible evidence pointing towards his guilt:

11        He was out.  He was dismissed against.  We heard he had been in
   conversation with this attorney.  He knew the level of evidence
12        against all the other defendants.  And he knew what he had left to
   bargain with.  The only thing he had left was [petitioner].
13

14        He was going to admit he did it wrong.  He was going to say that his
   friend, Rich Johnson, did it wrong because Rich Johnson is not here
   to be punished today with everybody.  He knew the state of the
15        evidence against Joey Randell.  Who was left.  Eric Haselton.

16  (RT 1491-92.)

17         Miller argued that Avelee Andrews was wrong in her testimony.  (RT 1492.)

18  Miller pointed out that Ms. Andrews initially stated one of the perpetrators wore a white T-shirt.

19  (RT 1492.)  Later, after she went to the show up, and two young men stood by the side of the road

20  with a light shining on them and one is wearing a T-shirt that says SQA in big letters, then Ms.

21  Andrews changed her statement to say the perpetrator had been wearing an SQA T-shirt.  (RT

22  1493.)  Miller asked the jury whether Andrews just forgot that detail and then remembered it

23  when she saw them by the road?  (RT 1493.)  Or did Andrews see them detained by the road and

24  had been told it was the get-away vehicle and just presume it was the perpetrators?  (RT 1493.)

25         Miller argued that Andrews' testimony was suspect because Andrews was

26  "positive" it was petitioner and Randell, that Andrews was really in shock, crying, and was putting

18

1  two and two together.  (RT 1493.)  Miller pointed out that Andrews was the only witness using a

2  six foot tall 180 pound description.  (RT 1493.)  Miller argued Andrews had little credibility

3  because her facts rarely matched any of the other witnesses.  (RT 1494.)  Miller pointed out that

4  Andrews was the only witness who testified she saw petitioner go up to the driver's side of the

5  jeep and punch the driver.  (RT 1494.)

6         Miller argued about the credibility of witness Kern's and witness Lund's

7  testimony.  (RT 1494-5.)  Miller pointed out that witness Brody Williams did not mention the

8  SQA or red dot – she saw a plain white T-shirt.  (RT 1496.)  Miller noted that the witnesses

9  deviated in their testimony as to when the assault happened, one said a year, one said hadn't been

10  a year, etc.  (RT 1497.)

11         Miller argued that it was incredible that the witnesses testified they had not

12  discussed the incident with anyone.  (RT 1497; 1498-99.)  Miller noted there was inconsistent

13  testimony about when Kern left the fight area.  (RT 1497.)  Miller argued there were even more

14  inconsistencies about what happened when the fight stopped.  (RT 1497-98.)  Miller argued it was

15  implausible that everyone rushed to the victim's aid and knelt by his head.  (RT 1498.)

16         Miller conceded that petitioner had blood all over his right shoe.  (RT 1499.)

17  Miller reminded the jury that there was expert testimony that petitioner's right shoe was not the

18  shoe that caused the bleeding.  (RT 1499.)  In addition, Miller pointed out that petitioner had no

19  blood on his right sock, his left shoe or left sock.  (RT 1499.)  Miller also reminded the jury that

20  there was expert testimony that the two little droplets of blood they had were going in opposite

21  directions.  (RT 1499.)  Miller argued there at least two people were bleeding, the victim and Rich

22  Johnson.  (RT 1500.)  Miller noted that the expert could not tell what position petitioner's shoe

23  was in when it got the blood on it.  (RT 1500.)  Miller argued that "blood was flying around."

24  (RT 1500.)  Miller stated there was testimony petitioner was around the fight, tried to break it up,

25  grabbed people that were bleeding, was between people that were bleeding, and blood was on the

26  ground near the victim's head.  (RT 1500.)

1    Miller argued that while Officer Helfrick was at the scene, taking witness

2  Andrews' statement, people were "yelling over her back or yelling from around her" (RT 1501),

3  equating it to an "auction for information."  (RT 1501.)  Miller suggested the officer might have

4  made a mistake.  (RT 1501.)  Officer Helfrick testified it would have been better if more officers

5  had been there.  (RT 1501.)

6    Miller argued that the line-up identification was suspect because the officer kept

7  making the witnesses keep looking, "proofread your own work."  (RT 1501.)

8    Miller argued about Randell's testimony:

9    Did [Randell] have inconsistent statements?  Yep.  Did he start with
     the three monkeys, see no evil, hear no evil.  Right, say no evil.
10   Almost the fourth monkey, you know, see no evil.  He almost had
     his hands on his rear end, didn't he.  I want to cover myself.  Yes, I
11   had contact with law enforcement and, yes, it usually turns out
     negative and, yes, I don't want it anymore.
12
     You have to consider the inconsistencies of his statements.  That's
13   what the instructions will tell you.  You have to consider the
     inconsistencies of his statement when you decide his credibility.
14   That's what you need to do.

15   But think about his personal circumstances each time he made the
     statement.  He testified here to you under oath after being
16   dismissed.  Jeopardy is attached.  They can't do anything to him for
     this crime.  And he didn't offer you up a lame excuse like Mr.
17   Franklin did.  Well, you know I was under oath – I wasn't under
     oath, excuse me.
18
     Now, he sat there and he took the questions from the district
19   attorney.  Without, obviously, answering my question, would any of
     you like to truly be examined, cross-examined, reexamined, recross
20 /////  examined by this team of attorneys?  Did you ever feel a little
21   nervous for the witnesses?  Think how they felt.

22
   (RT 1501-02.)
23
24    Miller then pointed out that out of the 50 - 250 people present during the fight,

25  only a few actually testified at this trial.  (RT 1502.)  Miller pointed out that the witnesses were

26  not "knocking down the doors" to come testify.  (RT 1502.)  Miller reminded the jury that

1   witnesses Lund and Trumbull testified because they were under subpoena to do so.  (RT 1502.)

2          Miller argued that even under cross-examination witness Helmsin did not waiver

3   that she saw petitioner away from the area while she "believed the commotion was still going on."

4   (RT 1504.)  Miller argued this testimony countered almost every prosecutorial witness who said

5   the defendants left together.  (RT 1504.)  Miller argued that Helmsin's testimony demonstrated

6   petitioner wasn't part of the fight.  (RT 1504.)

7          Miller argued the jury would have to weigh Sanford's credibility.  (RT 1504.)

8          Miller reminded the jury that witness Chris Wilmott testified he saw petitioner

9   pull, push, get involved and try to break up the fight.  (RT 1504.)  Miller denied there was a

10   conspiracy where everyone got together and made up a story.  (RT 1505.)  Miller argued that there

11   were a lot of people who saw a terrible event and they told what they believe they remember

12   seeing.  (RT 1505.)

13          In closing, Miller argued that petitioner didn't assault anyone.  "He didn't simply

14   assault anyone.  He didn't greatly assault anyone.  He didn't do it. . . . No, he didn't do anything

15   wrong. . . .  As a matter of fact, he tried to do something right.  That's what he wanted to do."

16   (RT 1506.)  Miller argued the prosecution had not met its burden of proof and the jury must return

17   a verdict of not guilty.  (RT 1506.)

18       E.   Analysis

19          At the time the prosecution moved to dismiss the charges against Randell,

20   attorneys Miller and Pappas were engaged in the representation of competing interests:  Miller

21   was representing petitioner, a criminal defendant, and Pappas was representing Randell, now a

22   witness for the prosecution.

23          Respondent contends that nothing in the record suggests that Miller and Pappas

24   worked together, noting that at trial each attorney only represented his own client.  (Answer at 12.)

25   However, just because the record does not reflect it, doesn't mean these law partners did not

26   brainstorm, share defense strategies or other legal work prior to the dismissal of the charges

1   against Randell, particularly when the dismissal occurred midway through the prosecution's case.

2   Certainly there is not the wealth of evidence in the record that counsel worked together as there

3   was in Burger, supra.  However, there is some evidence in this record that counsel would appear

4   in court on each other's behalf, suggesting some sharing of information was taking place.  (See

5   n.4 supra.)  On September 28, 1988, at a hearing on a motion to consolidate and join defendants,

6   attorney Miller stood in for attorney Pappas, representing petitioner's co-defendant Randell as

7   well as petitioner.  (RT 1.)  At the December 9, 1998 hearing on the prosecution's motion to

8   amend the complaint, attorney Pappas stood in for attorney Miller, representing petitioner as well

9   as Randell.  (RT 6.)

10          Petitioner's argument that the joint representation "may" have affected plea

11   bargaining and sentencing is insufficient to demonstrate an actual conflict or prejudicial effect.

12   Cuyler, 446 U.S. at 348.

13          However, upon reviewing the relevant record, the undersigned agrees that the

14   alleged conflict of interest resulting from the concurrent representation of Randell and petitioner

15   by law partners did not adversely affect counsel's performance in this case.  Even assuming an

16   actual conflict of interest that was not effectively "waived," petitioner has failed to clear the

17   "substantial hurdle" of demonstrating that a conflict "actually affected" counsel's performance in

18   an adverse way.  See Lockhart, 250 F.3d at 1231.

19          The United States Supreme Court has held that a conflict gives rise to an adverse

20   effect on counsel's representation when it "'prevent[s] an attorney . . . from arguing . . . the

21   relative involvement and culpability of his clients in order to minimize the culpability of one by

22   emphasizing that of another.'"  Wheat v. United States, 486 U.S. 153, 160 (1988) (quoting

23   Holloway, 435 U.S. at 490).  That is not the case here.  There was no attempt by Miller to

24   minimize the culpability of Randell at the expense of petitioner.  And, based on the evidence, such

25   a position would not have been prudent.  There was no blood found on Randell's shoes and little

26   evidence supporting Randell's culpability, which is why the prosecution ultimately moved to

1   dismiss charges against Randell.

2          Moreover, Miller directly attacked Randell's credibility, during cross-examination

3   and in closing argument.  Miller asked Randell whether he had made a deal with the prosecution

4   to get the charges dropped.  (RT 804.)  In closing argument, Miller pointed out Randell's

5   inconsistent statements.  The record reflects that Miller's cross-examination was thorough.  It

6   does not appear that counsel's overall performance was adversely affected by the possible

7   conflict.

8          Petitioner argues that the conflict prevented Miller from asking specific questions

9   during Randell's cross-examination, suggesting counsel should have inquired about the

10  circumstances leading to the dismissal of the case against him.  However, counsel did inquire

11  during cross-examination whether Randell had struck a deal with the prosecution.  Randell

12  confirmed the dismissal had come as a surprise.  This court is not persuaded that further inquiry

13  into the surprise dismissal would have made petitioner's counsel more effective in his defense.

14  Physical evidence demonstrated petitioner was more culpable than Randell.  While Randell's

15  testimony provided one more witness who claimed petitioner "may have" kicked the victim once,

16  which Randell uttered in response to the police officer's comment that there was blood on

17  petitioner's shoe, it was minimized by his unwavering testimony that he did not see petitioner kick

18  the victim.  The court has reviewed Randell's testimony and cannot find that the state court's view

19  that Randell's testimony was generally favorable to petitioner was an unreasonable determination

20  of the facts.  Moreover, failure to cross-examine Randell in the areas now suggested by petitioner

21  did not result in prejudice to his cause.

22         In light of all of the evidence presented at trial and the overall performance of

23  petitioner's counsel, petitioner has failed to show that an actual conflict adversely affected the

24  performance of trial counsel Miller.  Accordingly, this claim should be denied.

25     F.  Conclusion

26         For the foregoing reasons, IT IS HEREBY RECOMMENDED that petitioner's

1    application for a writ of habeas corpus be denied.

2          These findings and recommendations are submitted to the United States District

3    Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within ten days

4    after being served with these findings and recommendations, any party may file written objections

5    with the court and serve a copy on all parties.  Such a document should be captioned "Objections

6    to Magistrate Judge's Findings and Recommendations."  Any reply to the objections shall be

7    served and filed within ten days after service of the objections.  The parties are advised

8    that failure to file objections within the specified time may waive the right to appeal the District

9    Court's order.  <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th Cir. 1991).

10   DATED:  August 26, 2005.

11

12                                    _____

13                                    UNITED STATES MAGISTRATE JUDGE

14   hase0903.157

15

16

17

18

19

20

21

22

23

24

25

26